UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-02149-TWP-KMB |
| | ) | |
| D. ZATECKY, ALSIP, STOMPER, | ) | |
| J. C. JACKSON, GRIFFIN, LUNSFORD, | ) | |
| HAMMOND, LAMAR Dr., LEVINE Dr., | ) | |
| WEXFORD OF INDIANA, LLC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING STATE DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment, filed pursuant to Federal Rule of Civil Procedure 56, by Defendants Dushan Zatecky ("Warden Zatecky"), Duane Alsip, Misty Stamper ("Ms. Stamper"[1]), J.C. Jackson ("Lt. Jackson"), Griffin ("Sgt. Griffin"), Lunsford ("Sgt. Lunsford"), and Hammond ("Officer Hammond") ("collectively "the State Defendants"). (Dkt. 105). *Pro se* Plaintiff John Taylor ("Mr. Taylor") sued the State Defendants—who were all correctional and administrative staff at Pendleton Correctional Facility—alleging that they were deliberately indifferent to his conditions of confinement and used excessive force against him.[2] (Dkt. 105.) For the reasons explained below, the Motion is **granted**.

## I.   STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *See* Federal Rule of Civil Procedure 56(a).  Summary judgment

---

[1] Mr. Taylor incorrectly identifies Misty Stamper as "Stomper"—the Clerk shall correct the spelling of her name.

[2] Mr. Taylor also sued the Medical Defendants (Dr. Lamar, Dr. Levine, and Wexford of Indiana, LLP). The Medical Defendants also moved for summary judgment. (Dkt. 98.) Their Motion has been resolved by separate order. (*See* Dkt. 116.)

is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

Despite having notice of his opportunity to respond to the State Defendants summary judgment motion--see Dkt. 109--Mr. Taylor failed to respond.[3] This failure to respond requires the court to treat the movant's version of the facts as uncontested. *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). Accordingly, facts alleged by the State Defendants in the Motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). Even though Taylor has failed to respond, the State Defendants must still show that summary judgment is proper given the undisputed facts. *See Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021).

---

[3] Mr. Taylor's August 31, 2022, response in opposition to summary judgment addressed only the Medical Defendants' claims. (*See* Dkt. 110.)

## II.  **FACTUAL BACKGROUND**

As noted earlier, Mr. Taylor has not responded to the summary judgment motion, so the Court treats the State Defendants' supported factual assertions as uncontested.  *See Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020); S.D. Ind. L.R. 56-1(b), (f).

### A.  **The Parties**

Mr. Taylor is an Indiana Department of Correction ("IDOC") inmate who at all relevant times was housed at Pendleton Correctional Facility ("Pendleton").  (Dkt. 106-1 at 8−9.)  The State Defendants were all employed at Pendleton.  Dushan Zatecky was the warden.  (Dkt. 106-4 at 6.)  Duane Alsip was the deputy warden.  (Dkt. 106-1 at 60.)  Jonathan Jackson was a correctional officer with the rank of Lieutenant.  (Dkt. 106-5 at 5.)  Boyd Lunsford and Jason Griffin were correctional officers with the rank of Sergeant.  (Dkt. 106-6 at 2; Dkt. 106-1 at 60.) Eric Hammond was a correctional officer.  (Dkt. 106-12.)  Misty Stamper was a program coordinator over visitation at Pendleton, but at all times relevant to Mr. Taylor's complaint, she was working as  a correctional officer supervising the inmates that were housed in F-Gym.  (Dkt. 106-7 at 2−3, 5−6.)

### B.  **IDOC's COVID-19 Precautions**

In response to the COVID-19 pandemic, on March 16, 2020, the IDOC implemented Executive Directive 20-20 which presented and authorized the IDOC's Pandemic Preparedness and Response Plan ("the Pandemic Response Plan") (Dkt. 106-10).  The purpose of the Pandemic Response Plan was to manage infectious diseases in the IDOC "through a comprehensive approach which includes prevention, testing, appropriate treatment, education, and infection control measures." (Dkt. 106-11 at 2.)  The Pandemic Response Plan outlined measures such as hand

washing, cough etiquette, enhanced cleaning, and surveillance activities surrounding identifying

sick inmates and separating them from healthy ones.  *See generally id.*

Several measures were taken at Pendleton to inform inmates about the pandemic and

prevent the spread of the virus.  Visitation was suspended.  (Dkt. 106-1 at 62.)  Inmates were

provided masks, and inmates and staff were required to wear masks.  *Id.* at 62, 64.  Inmates were

advised through the offender TV channel and educational posters to practice social distancing,

wear masks, and wash their hands.  (Dkt. 106-4 at 8; Dkt. 106-8; Dkt. 106-1 at 63−65.)

**C.**     **Mr. Taylor's Living Locations and Moves**

Mr. Taylor was living in general population in the K-5 dorm in Pendleton in early 2020.

(Dkt. 106-1 at 67.)  On April 12, 2020, Mr. Taylor and approximately 15−20 other inmates were

moved to the IRT, a housing unit typically for mentally ill inmates, because they had high

temperatures.  *Id.* at 67−68.  Mr. Taylor understood that staff wanted to isolate these inmates due

to COVID-19 concerns.  *Id.* at 70−72.  Although he had not yet been tested, Mr. Taylor assumed

he had COVID-19 because he was experiencing symptoms consistent with the virus.  *Id.* at 72−73.

In the IRT, the inmates were placed in cells by themselves, whereas the K-5 dorm consisted of one

big room with 50−60 people assigned to bunk beds that are lined up.  *Id.* at 71.

Warden Zatecky visited the inmates in IRT on April 13, 2020.  *Id.* at 74.  He told the

inmates that no one would lose their jobs, and they would be taken care of.  *Id.* at 74−75.  Mr.

Taylor asked Warden Zatecky whether the inmates would be moved to the gym, and Warden

Zatecky said no. *Id.* at 75; Dkt. 106-2 at 17 (*see* 97).[4]  Mr. Taylor did not want to move to the gym

because he believed inmates there were probably sick, and he could more easily socially distance

---

[4] State Defendants submitted Mr. Taylor's deposition transcript in three different parts: Dkts. 106-1, 106-2, and 106-3. Because these are excerpts and not full transcripts, there is a difference in CMECF's numbering system and the court reporter's numbering system; therefore, the Court will first cite to the CMECF page number in blue, and then to the transcript page number in parentheses.

in the IRT.  *Id.* at 17−19 (*see* 97−99).  Mr. Taylor had a fever and other COVID-19 symptoms while he was in the IRT.  *Id.* at 1 (*see* 81).

On April 14, 2020, Sgt. Lunsford and Sgt. Griffin came to the IRT and told the inmates to pack their belongings because they were being moved to F-gym.  (Dkt. 106-1 at 80.)  They were told that an inmate named Simon had tested positive for COVID-19 and was being moved to IRT. *Id.*  The F-gym was designated as a quarantine unit.  (Dkt. 106-4 at 3.)  Dr. Kristen Dauss, IDOC's medical director, had advised correctional staff to house inmates who tested positive in quarantine units.  *Id*.  The floor space in F-gym was large enough and larger than any living area of the inmate housing units for inmates to be able to socially distance from one another.  *Id.* at 9.  Mr. Taylor still experienced COVID-19 symptoms in the gym.  (Dkt. 106-2 at 5 (*see* 85).)  He wore his mask and tried as best as he could to socially distance from other inmates.  *Id.* at 5−6 (*see* 85−86).

On April 15, 2020, the Indiana Department of Health came to Pendleton and tested all of the inmates in the gym for COVID-19.  *Id.* at 8 (*see* 88).)  Of the 40 inmates tested, 21 received positive results, including Mr. Taylor. (Dkt. 106-14 at 1−2.)  None of the State Defendants were involved in administering the COVID-19 tests. (Dkt. 106-2 at 9−12 (*see* 89−92).)  Dr. Dauss recommended in an email that the inmates who tested positive should remain housed in one area and those that tested negative should be moved to isolation cells in order to decrease the risk of more inmates getting sick.  (Dkt. 106-14 at 1.)  Thus, the decision was made to move all COVID-positive inmates to F-gym and move the negative inmates into isolation cells in another building. (Dkt. 106-4 at 5.)

**D.**     **The April 17, 2020 Gym Riot**

On April 17, 2020, Lt. Jackson told Ms. Stamper that the hazardous materials ("Hazmat") team was coming to clean the F-gym due to COVID-19.  (Dkt. 106-7 at 3; Dkt. 106-4 at 2.)  Lt. Jackson was in the gym overseeing the cleaning and the moving of the inmates.  (Dkt. 106-5 at

3−5.)  Ms. Stamper instructed the inmates to store their property on their beds to make room for the Hazmat team to clean.  (Dkt. 106-7 at 3.)  At this time, neither Mr. Taylor nor the other inmates had learned their test results.  (Dkt. 106-2 at 48 (*see* 128).)  Mr. Taylor observed Lt. Jackson escorting inmate Simon into the gym, and the other inmates started to yell to get him out of there because they knew he had tested positive for the virus.  *Id.* at 47−49 (*see* 127−29).  Inmate Aaron Windom tried to use one of the pay phones in the gym to call his family.  *Id.* at 49−51 (*see* 129−31).

Ms. Stamper called an emergency signal for other staff to come to the gym to assist her. (Dkt. 106-12; Dkt. 106-5 at 3.)  Sgt. Lunsford and Officer Hammond arrived and tried to get inmate Windom to calm down and cuff up.  (Dkt. 106-6 at 6; Dkt. 106-2 at 51−52 (*see* 131−32).)  Lt. Jackson also called an emergency signal and requested the weapons team because of the number of inmates approaching staff.  (Dkt. 106-12; Dkt. 106-4 at 5.)

The video of the incident shows several inmates, including Mr. Taylor, get close to Ms. Stamper and other staff.  (Dkt. 107 at 10:40.)  Ms. Stamper told the inmates to step back at least twice.  (Dkt. 106-7 at 5.)  She felt like they were going to attack her and was afraid for her safety.  *Id.*  Ms. Stamper deployed oleoresin capsicum ("OC") spray on one of the inmates because he refused to step back. (Dkt. 106-7 at 6; Dkt. 107 at 10:41.)  Some of the spray went in the direction of Mr. Taylor.  (Dkt. 106-2 at 67 (*see* 147).)

Inmate Nicholas LaCruze lunged toward Ms. Stamper and punched her in the face, knocking her to the ground.  (Dkt. 106-12; Dkt. 106-4 at 5.)  Sgt. Lunsford went to help Ms. Stamper, and several inmates began beating him until he lost consciousness. (Dkt. 107 at 10:41; Dkt. 106-12.)  Mr. Taylor kicked Sgt. Lunsford as he was curled up on the ground.  (Dkt. 107 at 10:41.)  Mr. Taylor then picked up a trash can and threw it in the direction of the gym entrance. *Id.*  Mr. Taylor says he did this to stop officers from assaulting inmate LaCruze.  (Dkt. 106-2 at 70

(*see* 150).)  After Mr. Taylor threw the trash can, he ran away.  *Id.* at 72 (*see* 152); Dkt. 107 at 10:41.

Mr. Taylor and the other inmates dispersed from where the fight was happening.  (Dkt. 107 at 10:41.)  Inmate Windom approached the door with a steel bar in a batting position before he was sprayed with OC spray.  *Id.* at 10:41.  The weapons team and additional staff arrived to assist, and the situation settled down.  *Id.* at 10:43.  Due to their injuries, Sgt. Lunsford, Ms. Stamper, and another staff member were taken to the hospital.  (Dkt. 106-12 at 2; Dkt. 106-13.)

Mr. Taylor was found guilty of rioting and assault on staff after receiving conduct reports.  (Dkt. 106-2 at 71 (*see* 151).)  He was also charged and pleaded guilty in the Madison Circuit Court to battery resulting in bodily injury to a public safety official, which resulted in an additional three years added to his sentence.  *Id.* at 78 (*see* 158); Dkt. 106-3 at 63.

Mr. Taylor had no personal interactions with any of the State Defendants after he threw the trash can.  (Dkt. 106-2 at 72 (*see* 152).)  He acknowledged that Lt. Jackson, Officer Hammond, and Sgt. Lunsford never touched him during the incident.  *Id.* at 41−43 (*see* 121−23).

The investigations office at Pendleton determined that the riot occurred because the inmates were upset that inmate Simon was going to be placed in the gym with COVID-19, and the inmates were not yet aware that they, too, were positive for the virus.  (Dkt. 106-15 at 2.)

E.     **Mr. Taylor's Placement in the D.O. Building and Transfer to Westville**

After the riot, Mr. Taylor was moved to a single cell in the D.O. building and remained there until he was transferred to Westville Correctional Facility. (Dkt. 106-2 at 4, 74−75 (*see* 84, 154−55).)  Immediately after the riot he was handcuffed for six hours while covered in pepper spray.  (Dkt. 1 at 14.)  He did not receive clean drinking water or access to a shower for several days.  *Id.* at 15.  Mr. Taylor did not see or speak with any of the State Defendants while housed in

the D.O. building.  (Dkt. 106-2 at 36 (*see* 116).)  He was transported to Westville on April 22, 2020, but none of the State Defendants were involved in his transport.  *Id.* at 73−74 (*see* 153−54).

### III.  <u>DISCUSSION</u>

Mr. Taylor alleges a variety of violations of the Eighth Amendment.  Relevant to the claims against the State Defendants, the Court identified the following claims at screening:

- COVID-19 housing and medical care claims against defendants Warden Zatecky, Deputy Warden Alsip, Ms. Stamper, Lt. Jackson and Lt. Griffin;

- Excessive force claims against Ms. Stamper, Lt. Jackson, Sgt. Lunsford, and Officer Hammond for their actions during the April 17, 2020 incident and for the six hours Mr. Taylor was handcuffed;

- Conditions of confinement claims against the State Defendants for the conditions in the D.O. Building.

(Dkt. 11 at 4−5.)

As a preliminary matter, "[i]ndividual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted).  Because Mr. Taylor acknowledged that he had no personal interactions with any of the State Defendants with respect to (1) his medical care as it related to his COVID-19 symptoms; (2) handcuffing him for six hours after the riot; or (3) placing him in the D.O. building without access to drinking water or a shower, summary judgment is granted to the Defendants on these claims, and the Court need not discuss them further.

### A.    <u>Conditions of Confinement Related to Housing Placement and COVID-19 Precautions</u>

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825,

832 (1994)). A conditions of confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind, *i.e.*, that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

Mr. Taylor believes that he should not have been moved from the IRT, where he could more easily socially distance, to the gym. A jury could find that placing Mr. Taylor in the gym with a group of inmates who were COVID-19-positive could pose a substantial risk of harm to his health or safety, satisfying the objective prong of the deliberate indifference analysis. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that the transmissibility of COVID-19 combined with a prison's dormitory-style housing presented a substantial risk that prisoners "will be infected with COVID-19 and have serious health effects as a result[.]").

But Mr. Taylor's claim fails on the subjective prong. In assessing the subjective prong, the question is whether the defendant "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. As a preliminary matter, Pendleton staff undertook efforts to prevent the spread of COVID-19 by implementing the IDOC's Pandemic Response Plan. This called for educating inmates and staff about washing hands and cough etiquette, making

inmates and staff wear masks, and encouraging inmates to socially distance when possible, among other things.  (Dkt. 106-11; Dkt. 106-1 at 62−64.)

Mr. Taylor was moved from his dorm to the IRT and then to the gym because he was suspected of having COVID-19 due to his symptoms and fever.  Separating sick inmates and healthy inmates was at the recommendation of IDOC's medical director and was consistent with the Pandemic Response Plan.  (Dkt. 106-14; Dkt. 106-11 at 9.)  Inmates had more room to socially distance in the gym than in the dorm.  (Dkt. 106-4 at 9.)  The Pendleton staff was in the process of summoning a Hazmat crew to thoroughly clean the gym before the fight broke out.  These actions show that the State Defendants were trying to remediate the harm caused by the virus, not that they "consciously disregarded an excessive risk" to Mr. Taylor's health or safety.  *Giles*, 914 F.3d at 1052.

The undisputed evidence is that Pendleton staff responded reasonably to the COVID-19 pandemic.  Other federal courts to have examined the issue have concluded that, because the prisons had implemented protective measures like those in the IDOC's Pandemic Response Plan, plaintiffs could not show that prison officials had a reckless disregard for the inmates' safety. *See Wilson*, 961 F.3d at 841 (finding deliberate indifference claim failed on the subjective prong because protective measures included screening, quarantining sick inmates, limiting group gatherings, screening inmates and staff, enhanced cleaning measures, and providing masks to inmates); *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) (vacating preliminary injunction because protective measures did not show state of mind necessary for deliberate indifference); and *Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (same). No jury could conclude that the State Defendants' actions evinced deliberate indifference, even though Mr. Taylor was sickened by the virus. *Farmer*, 511 U.S. at 844.

Accordingly, summary judgment is **granted** as to all conditions of confinement claims.

10

**B.**     **Excessive Force During the April 17, 2020 Incident**

The Court turns to Mr. Taylor's excessive force claim as it relates to the riot in the F-gym.

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).

As the Seventh Circuit has explained,

The ultimate determination of the intent of the person applying the force in an excessive force claim involving prison security measures depends upon a number of factors, including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

*McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019) (internal citations omitted).

Mr. Taylor testified that he named Officer Hammond as a defendant because he was present during the riot, (Dkt. 106-2 at 42 (*see* 122)); he named Sgt. Lunsford because he participated in moving inmates to the gym, *id.* at 45 (*see* 125)); and he named Sgt. Griffin because he was a sergeant and should have intervened to prevent moving the inmates to the F-gym, *id.* at 43–44 (*see* 123–24).) The video also shows that these officers used no force whatsoever against Mr. Taylor. (Dkt. 107.) Accordingly, summary judgment is granted to these defendants due to lack of personal involvement.

The only defendant who used any force against Mr. Taylor was Ms. Stamper. On April 17, 2020, Ms. Stamper was in fear of her life and described being directly threatened as follows:

Offender Windom was threatening all staff. He was making comments to other offenders along the lines of "fuck these staff members", lets show the staff we are serious", and comments about "fucking up the staff". Offender Windom was being

11

> disorderly. Several offenders were coming up toward me and refusing orders to step bac,. I know that I told several inmates to step back at least two times. The inmates were refusing orders. The inmates I specifically remember are Offenders Jimmie Hair, John Taylor and Antonio Rose, but there were several others. Some of the inmates like offense rose were standing with a demeanor and with a posture as if they were ready to attack. I felt like my life was in danger. Offender Nicholas La Cruze ran up toward me out of nowhere and punched me/struck me in the face with a closed fist knocking me to the floor.

(Dkt. 106-7 at 5.)  Applying the relevant factors, no reasonable jury could find that Ms. Stamper used excessive force.

A review of the video shows that Ms. Stamper's actions were justified and were motivated by a desire to restore discipline.  (Dkt. 107.)  The threat was obvious, as tensions ran high in the gym.  The inmates were upset about being housed with an inmate who was known to be COVID-19 positive, and—even without audio—the video makes it plain that they were approaching Ms. Stamper with a hostile and menacing attitude.  (Dkt. 107 at 10:40−41; Dkt. 106-15 at 2.)  Because the inmates outnumbered Ms. Stamper, the need for the use of force was high.  She pepper-sprayed one inmate to get him to move away from her, and the spray hit Mr. Taylor.  (Dkt. 106-2 at 67 (*see* 147).)  The amount of force and the resulting injury to Mr. Taylor was low, while three staff members from Pendleton needed to be taken to the hospital for their injuries.  Accordingly, Ms. Stamper is entitled to summary judgment.

## IV.  CONCLUSION

For the reasons explained above, State Defendants' Motion for Summary Judgment, Dkt. [105], is **GRANTED**.  Final judgment will issue in a separate entry.

**SO ORDERED.**

Date:  3/7/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

12

DISTRIBUTION:

John Taylor, #249221
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
Carlisle, Indiana  47838

Adrienne Nicole Pope
OFFICE OF THE INDIANA ATTORNEY GENERAL
adrienne.pope@atg.in.gov

Gustavo Angel Jimenez
OFFICE OF THE INDIANA ATTORNEY GENERAL
Gustavo.jimenez@atg.in.gov

Douglass R. Bitner
STOLL KEENON OGDEN PLLC
doug.bitner@skofirm.com